SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
PETER H. KLEE, Cal. Bar No. 11170
pklee@sheppardmullin.com
JORDAN S. DERRINGER, Cal. Bar No. 255992
jderringer@sheppardmullin.com
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Telephone: 619.338.6500
Facsimile: 619.234.3815

Attorneys for Defendant
ALLSTATE NORTHBROOK INDEMNITY COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ERIKA MEJIA MARINELARENA,

Plaintiff,

v.

ALLSTATE NORTHBROOK INDEMNITY COMPANY, an Illinois corporation,,

Defendant.

Case No. 8:20-cv-2230 DOC (JDEx)

**ALLSTATE NORTHBROOK INDEMNITY COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

District Judge David O. Carter
Magistrate Judge John D. Early

**Hearing Date:** **January 10, 2022**
**Hearing Time:** **8:30 a.m.**
**Courtroom:** **9D**

[Complaint Filed: November 24, 2020]

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

A. The Accident and Marinelarena's Allstate Policy. ..... 4

B. Marinelarena immediately hires an attorney. ..... 5

C. Marinelarena demands arbitration of her UM claim. ..... 5

D. Nokes makes a policy limit demand. ..... 6

E. Allstate immediately begins evaluating the demand; because it reasonably questions Dr. Chambi's surgical recommendation, Allstate schedules an IME. ..... 6

F. Dr. Kaloostian concludes that the accident exacerbated a pre-existing condition and disagrees with Dr. Chambi's surgical recommendation. ..... 8

G. Allstate evaluates the demand and makes a reasonable settlement offer. ..... 9

H. Two months later, Nokes rejects Allstate's offer and tells Allstate to assign arbitration counsel. ..... 10

I. Allstate assigns counsel and begins the arbitration process. ..... 11

J. Marinelarena requests several extensions to complete discovery. ..... 11

K. Marinelarena serves a section 998 offer for $100,000, but no new information is provided to change Allstate's evaluation. ..... 11

L. The parties proceed to arbitration and Allstate pays the arbitration award and costs. ..... 12

II. PLAINTIFFS' BAD FAITH CLAIM HAS NO MERIT ..... 12

A. General Bad Faith Standards ..... 12

1. Bad faith is the unreasonable withholding of policy benefits due. ..... 12

2. Mistakes are not enough to show unreasonableness. ..... 13

3. The existence of a "genuine dispute" precludes a finding of unreasonableness. ..... 13

B. Allstate's reliance on Dr. Kaloostian's opinions precludes Marinelarena's bad faith claim. ..... 14

C. Marinelarena cannot show she was entitled to benefits, so her bad faith claim fails. ..... 17

D. Allstate cannot be liable for "unreasonable delay" while it gathered relevant information to evaluate plaintiffs' claim.................. 19

E. Marinelarena's bad faith claim is time barred. ..................................... 20

F. Marinelarena's inability to show economic loss precludes an award for emotional distress or punitive damages................................ 22

G. The punitive damages claim fails as a matter of law. .......................... 23

III. CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aceves v. Allstate Ins. Co.*
68 F.3d 1160 (9th Cir. 1995) ........ 13

*Adams v. Allstate Ins. Co.*
187 F. Supp. 2d 1207 (C.D. Cal. 2002) ........ 15

*Allstate Ins. Co. v. Madan*
889 F. Supp. 374 (C.D. Cal. 1995) ........ 15

*Anderson v. Liberty Lobby Inc.*
411 U.S. 242 (1986) ........ 24

*In re Angelia P.*
28 Cal. 3d 908 (1981) ........ 24

*Archdale v. Am. Internat. Specialty Lines Ins. Co.*
154 Cal. App. 4th 449, 64 Cal. Rptr. 3d 632 (2007) ........ 20

*Aronson v. State Farm Ins. Co.*
No. CV-99-4074 CAS BQRX, 2000 WL 667285, at *10 (C.D. Cal. May 11, 2000) ........ 15

*Badell v. Celtic Life Ins. Co.*
159 F. Supp. 2d 1186 (N.D. Cal. 2001) ........ 15

*Beck v. State Farm*
54 Cal. App. 3d 347 (1976) ........ 24

*Blake v. Aetna Life Ins. Co.*
99 Cal. App. 3d 901 (1979) ........ 19

*Blankenship v. Allstate Ins. Co.*
186 Cal. App. 4th 87 (2010) ........ 18

*Board of Trustees of Univ. of Illinois v. Insurance Corp. of Ireland*
969 F. 2d 329 (7th Cir. 1992) ........ 24

*California Shoppers, Inc. v. Royal Globe Ins. Co.*
175 Cal.App.3d 1 (1985) ........ 19

*Cardiner v. Provident Life and Accident Ins. Co.*
158 F. Supp. 2d 1088 (C.D. Cal. 2001) .......... 15

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*
90 Cal. App. 4th 335 (2001) .......... 12, 13, 14, 15

*Continental Ins. Co. v. Superior Court*
37 Cal. App. 4th 69 (1995) .......... 23

*Cruz v. HomeBase*
83 Cal. App. 4th 160 (2000) .......... 25

*Dalrymple v. United Servs. Auto. Assn.*
40 Cal. App. 4th 497 (1995) .......... 14

*Davies v. Krasna*
14 Cal. 3d 502 (1975) .......... 20

*Dlugitch v. Liberty Mut. Fire Ins. Co.*
2014 U.S. Dist. LEXIS 66396 (C.D. Cal. April 22, 2014) .......... 21

*Feldman v. Allstate Ins. Co.*
322 F.3d 660 (9th Cir. 2003) .......... 13, 14

*Fraley v. Allstate Ins. Co.*
81 Cal. App. 4th 1282 (2000) .......... 12, 13, 14, 15, 16

*Globe Indemnity Co. v. Superior Court*
6 Cal.App.4th 725 (1992) .......... 19

*Guebara v. Allstate Ins. Co.*
237 F. 3d 987 (9th Cir. 2001) .......... 12, 13, 14, 15

*Herr v. State Farm Mut. Auto. Ins. Co.*
152 F.3d 925 (9th Cir. 1998) (unpublished) .......... 15

*Juarez v. 21st Century Ins. Co.*
105 Cal. App. 4th 371 (2003) .......... 18

*Kerrigan v. Allstate Ins. Co.*
--- F.Supp.3d ---; 2021 WL 2389644 (C.D. Cal. June 10, 2021) .......... 14, 18

*Keshish v. Allstate Ins. Co.*
959 F. Supp. 2d 1226 (C.D. Cal. 2013) .......... 15

*Love v. Fire Ins. Exch.*
221 Cal. App. 3d 1136 (1990) .......... 21

*Maxwell v. Fire Ins. Exch.*
60 Cal. App. 4th 1446 (1998) .......... 22

*Maynard v. State Farm Mut. Auto. Ins. Co.*
499 F. Supp. 2d 1154 (C.D. Cal. 2007) .......... 12, 13, 14, 15, 19

*McCarthy v. State Farm Mut. Ins. Co.*
2000 U.S. Dist. LEXIS 12020 (C.D. Cal. August 7, 2000) (Collins, J.) .......... 22, 23

*Merrit v. Reserve Ins. Co.*
34 Cal. App. 3d 858 (1973) .......... 13

*Miller v. Allstate Ins. Co.*
1998 WL 937400 (C.D. Cal. Sept. 21, 1998) .......... 15

*Morris v. Paul Revere Life Ins. Co.*
109 Cal. App. 4th 966 (2003) .......... 13, 14

*Myers v. Allstate Indem. Co.*
109 F. Supp. 3d 1331 (C.D. Cal. 2015) .......... 17, 18, 19

*Nager v. Allstate Ins. Co.*
83 Cal. App. 4th 284 (2000) .......... 14

*Notrica v. State Compensation Ins. Fund*
70 Cal. App. 4th 911 (1999) .......... 13

*O'Hara v. Western Seven*
75 Cal. App. 3d 798 (1977) .......... 24

*Opsal v. United Servs. Auto. Assn.*
2 Cal. App. 4th 1197 (1991) .......... 14

*Paulson v. State Farm Mut. Auto. Ins. Co.*
867 F. Supp. 911 (C.D. Cal. 1994) .......... 15

*Rappaport-Scott v. Interins Exch. of the Auto. Club*
146 Cal. App. 4th 831 (2007) .......... 12, 13, 14, 20

*Sahakyan v. Explorer Ins. Co.*
2020 Cal. Super. LEXIS 2978 (July 24, 2020) (Kin, J.) .......... 17, 18

*Shade Foods, Inc. v. Innovative Prods. Sales & Mktg.*
78 Cal. App. 4th 847 (2000) .......... 24

*Shamiryan v. Allstate Northbrook Indem. Co.*
--- F. Supp. 2d ---; 2021 WL 3185782 (C.D. Cal. July 26, 2021) .......... 14

*Singer v. State Farm Mut. Auto. Ins. Co.*
116 F.3d 373 (9th Cir. 1997) .......... 21

*State Farm Fire & Cas. Co. v. Superior Court*
45 Cal. App. 4th 1093 (1996) .......... 13

*Stewart v. Truck Ins. Exch*
17 Cal. App. 4th 468 (1993) .......... 23, 24

*Tento Int'l, Inc. v. State Farm Fire & Cas. Co.*
222 F.3d 660 (9th Cir. 2000) .......... 13

*Tomaselli v. Transamerica Ins. Co.*
25 Cal. App. 4th 1269 (1994) .......... 24

*Waters v. United Services Auto. Assn.*
41 Cal. App. 4th 1063 (1996) .......... 22

*White v. Ultramar, Inc.*
21 Cal. 4th 563 (1999) .......... 25

*Wilson v. 21st Century Ins. Co.*
42 Cal.4th 713 (2007) .......... 16

*Yan Fang Du v. Allstate Ins. Co.*
697 F.3d 753 (9th Cir. 2012) .......... 19

*Zurich Ins. Co. v. Killer Music, Inc.*
998 F.2d 674 (9th Cir. 1993) .......... 19

<u>Statutes</u>

Cal. Civ. Code § 998 .......... 11

Cal. Civ. Code § 3294 .......... 23

Cal. Civ. Code § 3294(c)(1) .......... 23

Cal. Civ. Code § 3294(c)(2) .......... 23

Cal. Civ. Code § 3294(c)(3) .......... 23

Cal. Ins. Code § 11580.2 .......... 18

Cal. Ins. Code § 11580.2(i) .......... 18

Cal. Ins. Code § 11580.2(o) .......... 18

Cal. Ins. Code § 11580.2, subd. b, (2) .......... 17, 18

## I. INTRODUCTION

Insurance companies are not required to pay the policy limit for an uninsured motorist ("UM") claim just because an insured demands it. Under California law, insurance companies have rights. They can investigate facts. They can gather information, i.e. medical records and bills. They can retain experts to conduct independent medical examinations. They don't have to rely solely on the information that an insured provides. After investigating the claim, an insurer is required to make a reasonable offer to resolve the claim. Sometimes that means an insurer agrees to pays the policy limit. Other times it doesn't. When there is a dispute over value, California law mandates that the dispute be settled by arbitration. An insurer that conducts a reasonable investigation, extends reasonable offers, and participates in arbitration is not liable for bad faith – even when the arbitrator awards the policy limit to the insured. Because Allstate exercised these rights under California law, it cannot be liable for bad faith in this case.

The plaintiff, Erika Mejia Marinelarena, was injured in a March 2016 multi-vehicle accident caused by a hit and run driver. Although the Insurance Code required Marinelarena, as a condition to making a UM claim, to provide a sworn statement to Allstate within 30 days of the accident stating that she had a cause of action against an unidentified driver, she never did. Instead, her lawyer, Beau Nokes, wrote to Allstate the month after the accident to introduce himself. He advised Allstate that he was representing Marinelarena in connection with the accident, but did not assert that she was or would be making a UM claim. Allstate responded to Nokes' introduction letter by asking whether there was anything it could do to assist him and his client. Nokes ignored this inquiry. Indeed, Allstate did not hear back from Nokes for nearly two years.

In December 2017, Nokes suddenly reappeared and told Allstate that Marinelarena was making a UM claim and he demanded that the claim be arbitrated. But he also said his arbitration demand was only to protect the statute of limitations.

He told Allstate that Marinelarena was still treating and that Allstate did not need to take any action until he presented a settlement demand.

Even though Nokes did not require any action, Allstate immediately took steps to investigate the UM claim, including requesting Marinelarena's medical records. A month later, Nokes provided some medical records and presented a settlement demand for the policy's $100,000 UM limit. The primary asserted basis for the $100,000 demand was Nokes' contention that Marinelarena would need a neck surgery due to injuries she suffered in the accident.

The medical records Allstate was provided, however, raised significant questions regarding whether the claimed need for surgery was warranted. Although one of Marinelarena's doctor's recommended surgery, the recommendation was not supported by her other doctors or by her medical records and objective test results. The records showed only minor soft tissue injuries, degenerative conditions, and limited treatment. Two of Marinelarena's doctors conducted objective medical testing (EMGs) and neurological exams with normal results. Moreover, despite her contention that she needed neck surgery, Marinelarena had taken no steps to undergo that procedure. Because of these inconsistencies, Allstate requested that Marinelarena undergo an independent medical examination ("IME") so that it could get input from a medical expert.

The IME was conducted by a board certified neurosurgeon, Dr. Paul Kaloostian. After examining Marinelarena and reviewing her medical records, Dr. Kaloostian determined that she did not require surgery. Dr. Kaloostian's findings were consistent with the information in the medical records (and Marinelarena's other doctors).

Based on Dr. Kaloostian's expert input, Allstate did not accept Marinelarena's policy limit demand. Instead, it offered to settle the claim for what it determined to be the reasonable value of the claim without surgery. Marinelarena

rejected Allstate's offer and demanded arbitration, which is the statutorily approved method of resolving disputed UM claims.

The arbitrator resolved the disputed medical issues in Marinelarena's favor and awarded her the $100,000 policy limit. Allstate promptly paid not only the full amount of the award, but also Marinelarena's arbitration costs. Despite being paid her policy limit and arbitration costs, Marinelarena thereafter filed this lawsuit, claiming that Allstate acted in bad faith. To this day, she still has not had a neck surgery.

Marinelarena's bad faith claim fails for any and all of the following reasons:

**Genuine Dispute Doctrine:** The genuine dispute doctrine precludes a finding of bad faith where an insurer relies on a medical expert's opinion. Here, Allstate reasonably questioned whether Marinelarena needed neck surgery. It hired Dr. Kaloostian to opine on the nature of Marinelarena's injuries and necessary treatment. Allstate had no reason to doubt Dr. Kaloostian's conclusions, including his finding that surgery was not warranted. He was well-qualified and his conclusions were consistent with Marinelarena's medical records.

**Insurance Code § 11580, subd. b (2):** In order to show an accident with an uninsured motorist, the Insurance Code requires that within 30 days of the accident, the insured provide a statement under oath to the insurer advising that the insured has a cause of action against an unknown person. Marinelarena never complied with this requirement. Her failure to do so precludes her ability to show she was entitled to UM benefits. In the absence of an entitlement to benefits, no bad faith claim exists. At a minimum, her right to policy benefits was stayed, which precludes a finding of bad faith delay.

**No unreasonable delay:** It is well-established that an insurance company cannot be liable for withholding policy benefits while it gathers the information needed to evaluate a claim. Here, Allstate diligently tried to investigate and

evaluate Marinelarena' claim. To the extent that there was any delay, it was caused by her, not Allstate.

**Statute of limitations:** In California, the statute of limitations for a claim for tortious breach of the implied covenant is two years from the date of accrual. Here, any bad faith claim would have accrued, at the latest, by April 9, 2018, when Allstate rejected Marinelarena's demand for the policy limit. She did not file this lawsuit until November 24, 2020, more than two and a half years later. Her bad faith claim is barred by the statute of limitations.

**No economic loss:** In order to recover damages for emotional distress and punitive damages, Marinelarena has to show that Allstate's alleged bad faith caused economic loss. Stated differently, there can be no emotional distress in the absence of economic loss. She cannot show any economic loss from Allstate's alleged bad faith. Therefore, she cannot recover emotional distress or punitive damages.

**Punitive Damages:** Regardless of how the Court rules on Marinelarena's bad faith claim, it should grant partial summary judgment on her punitive damages claim. There is no evidence – let alone the requisite clear and convincing evidence – of malice, oppression, or fraud by Allstate, or ratification by a managing agent.

## II. FACTUAL BACKGROUND

### A. The Accident and Marinelarena's Allstate Policy.

On March 23, 2016, Marinelarena was involved in a four car accident. She was the third car in line. (SUF, No. 1.) The first car, a hit-and-run driver, rear-ended the car behind Marinelarena. (Ex. A.)[1] That car was pushed into the back of Marinelarena's car. (*Id.*) Marinelarena bumped into the car in front of her. (*Id.*) The accident was reported to Allstate the next day. Marinelarena did not, however, within 30 days after the accident (or at any time), provide Allstate with a statement

[1] All referenced exhibits are located in the Index of Exhibits.

under oath stating that she had a cause of action against a person whose identity was unascertainable and set forth facts in support thereof. (SUF, No. 2.)

Marinelarena's Allstate policy had UM coverage limits of $100,000 and required arbitration if the parties did not agree on the amount of damages an insured is entitled to recover. (SUF, Nos. 3, 4.) It states, in part: "If **you** and **we** disagree on **your** right to receive any damages or on the amount, then upon the request written request of either party, the disagreement will be settled by a single neutral arbitration." (SUF, No. 4.)

**B. Marinelarena immediately hires an attorney.**

On April 19, 2016, Marinelarena's lawyer, Beau Nokes wrote to Allstate and advised that he was representing Marinelarena "concerning her bodily injury claim arising from the above referenced loss." (SUF, No. 5.) The letter did not state that Marinelarena was or would be making a UM claim. Allstate adjuster Karen Takeuchi responded two days later and asked Nokes to "please let me know if I may be of assistance to you in this matter." (SUF, No. 6.) Nokes did not respond to this invitation.

**C. Marinelarena demands arbitration of her UM claim.**

Nokes waited 21 months before he contacted Allstate concerning Marinelarena's bodily injuries. (Deposition of Beau Nokes ("Nokes depo.") at 138:5-139:6.) On December 5, 2017, he wrote to Allstate and advised – for the first time – that he was pursuing a UM claim for Marinelarena. (SUF, No. 7.) Nokes served a "Demand for Uninsured Motorist Arbitration." (*Id.*) The cover letter stated: "I am sending this demand only to protect the statute of limitations. No formal response will be required until after I have submitted a demand package. Ms. Marinelarena's treatment is ongoing." (*Id.*)

After Allstate received Nokes's letter, adjuster Tina Fuizzotti spoke with him. (Fuizzotti Decl. at ¶24.) Nokes detailed Marinelarena's treatment and told adjuster Fuizzotti that even though Marinelarena was diagnosed with radiculopathy, her

EMG test was normal. (Fuizzotti Decl. at ¶25; Ex. H at CN000067.) Nokes agreed to provide Allstate with the medical records and bills he had for Marinelarena. (Fuizzotti Decl. at ¶26.) Adjuster Fuizzotti advised that Allstate may need prior records and an independent medical exam ("IME"). (Fuizzotti Decl. at ¶27; Ex. H at CN000067.) Nokes told Allstate that *he* would provide everything Allstate needed to evaluate the claim. (Fuizzotti Decl. at ¶28; Ex. H at CN000067.)

On January 12, 2018, Nokes began sending Marinelarena's medical records and bills to Allstate. (SUF, No. 8.) Prior to that, Nokes never sent any medical records or bills to Allstate. (SUF, No. 9.)

**D. Nokes makes a policy limit demand.**

On January 16, 2018, Nokes told Allstate that he had just received a report from Dr. Israel Chambi recommending neck surgery for Marinelarena. (Fuizzotti Decl. at ¶31; Ex. H at CN000079.) Therefore, Nokes made a policy limit demand. (SUF, No. 10.)

**E. Allstate immediately begins evaluating the demand; because it reasonably questions Dr. Chambi's surgical recommendation, Allstate schedules an IME.**

On January 18, 2018, adjuster Fuizzotti noted that she needed to confirm if Allstate had all of Marinelarena's medical records and bills; and, because there was a surgical recommendation, Allstate may need prior records and films. (Fuizzotti Decl. at ¶33; Ex. H at CN000092.) Between January 18, 2018 and the middle of February 2018, Allstate gathered all of the medical records and bills that Nokes had. (SUF, No. 11.)

Based on the records provided, Allstate had legitimate questions regarding Dr. Chambi's surgical recommendation. (Fuizzotti Decl. at ¶35.) The records that were provided did not show an acute injury from an accident; her condition appeared degenerative. (Fuizzotti Decl. at ¶36; Ex. H. at CN000107.) The records also showed that Marinelarena had received only limited medical treatment:

(1) she went to the emergency room on the day of the accident where she was diagnosed with soft tissue injuries and released (Ex. X at ALL001711-1746);

(2) she saw her primary care physician about a week later and was told to take the medicine that she was prescribed (she admitted that she had not filled it) and told to do home exercise (Ex. Y at ALL01792-1801);

(3) she went to a chiropractor four months after the accident and treated about once a week for another four months – 16 visits total (Ex. Z at 1812-1820);

(4) on January 24, 2017, she had an MRI of her cervical spine that showed "mild degenerative changes" (Ex. AA at ALL002171-2174.);

(4) on March 24, 2017, she saw Dr. Madhu Katakia, a board-certified neurologist. Dr. Katakia performed a neurological exam and EMG, both of which were normal, and diagnosed her with cervical sprain (Ex. BB at ALL001868-ALL001878.) ;

(5) on November 6, 2017, she saw Dr. Diana Munoz, board-certified in physical medicine and rehabilitation. Dr. Munoz performed a neurological exam and EMG, both of which were normal (Ex. CC at ALL002218-2232.); and

(6) she had four consultations with Dr. Chambi (Ex. DD at ALL001853-1866.)

Adjuster Fuizzotti told Nokes that it looked like there were pieces missing from the records because Dr. Chambi was "jumping to surgery w/o trying [] more conservative tx [treatment] like ESI [epidural steroid injections]." (Fuizzotti Decl. at ¶38; Ex. H. at CN000107.) For these reasons, adjuster Fuizzotti thought it made

sense for Allstate to investigate further and seek an independent medical examination. (Fuizzotti Decl. at ¶¶35-40.)

On February 9, 2018, adjuster Fuizzotti wrote to Nokes and told him that several records were still outstanding and Allstate wanted to schedule an IME. (SUF, No. 12; Ex. K.) She also asked Nokes to grant an open extension so that Allstate could obtain the additional information and investigation needed. (Fuizzotti Decl. at ¶41; Ex. K.) Nokes agreed to the IME, but would not grant Allstate's request for an open extension. (Fuizzotti Decl. at ¶42; Ex. H at CN000108-109).

On February 14, 2018, adjuster Fuizzotti contacted ExamWorks, an outside vendor that Allstate used to locate well-qualified doctors for independent medical exams. (Fuizzotti Decl. at ¶43.) ExamWorks provided three CVs for Allstate's consideration.[2] (Fuizzotti Decl. at ¶44; CN000116-117.) Because all of the doctors were well-qualified, Allstate picked Dr. Paul Kaloostian, a board certified neurosurgeon who was on the teaching staff at the University of California at Riverside. (Fuizzotti Decl. at ¶45.) It was willing, however, to use a different doctor if travel was an issue. (Fuizzotti Decl. at ¶46; Ex. H. at CN000115-116). But it wasn't. And Nokes agreed to an IME with Dr. Kaloostian on March 12, 2018. (SUF, No 13.)

**F. Dr. Kaloostian concludes that the accident exacerbated a pre-existing condition and disagrees with Dr. Chambi's surgical recommendation.**

On March 12, 2018, Dr. Kaloostian examined Marinelarena. (SUF, No. 14.) On March 29, 2018, Allstate received Dr. Kaloostian's report. (Declaration of Jennifer Marshall ("Marshall Decl." at ¶20; Ex. H at CN000145.) His conclusions were based on a review of Marinelarena's medical records, the history she provided, and his physical examination. (SUF, No. 15; Ex. M.) Dr. Kaloostian determined

---

[2] ExamWorks provided CVs for Dr. Paul Kaloostian, Dr. Sumeet Vadera, and Dr. Samer S. Ghostine. (Fuizzotti Decl. at ¶44.)

that the accident exacerbated Marinelarena's pre-existing myofascial inflammation of the neck and low back. (SUF, No. 17.) Dr. Kaloostian did not believe that surgery was warranted or would help Marinelarena's current complaints; to the contrary, he concluded that surgery would predispose her to more complications in the future. (SUF, No. 17.) He determined that treatment up to six months from the date of the accident would have been reasonable and necessary. (SUF, No. 17.)

**G. Allstate evaluates the demand and makes a reasonable settlement offer.**

On April 3, 2018, Allstate adjuster Jennifer Marshall evaluated the claim. (SUF, No. 18.) First, she reviewed the facts of the loss, Marinelarena's medical records, reports, and bills, and Dr. Kaloostian's report. (SUF, No. 19.)

Next, adjuster Marshall calculated special damages, i.e. the reasonable and necessary medical expenses. As is customary, she reduced the amount of the gross medical bills to the amounts that are reasonably and customarily charged for the services performed.[3] (SUF, No. 20.) Because she believed that Dr. Kaloostian's conclusions were reasonable and consistent with the information in Marinelarena's medical records, she further adjusted the medical expenses based on his opinion. She allowed only those charges for treatment incurred up to six months from the date of the accident. (SUF, No. 21; Marshall Depo. at 67:4-22, Ex. N.; Marshall Decl. at ¶¶19-22.)

Next, adjuster Marshall calculated general damages. (SUF, No. 22.) With the assistance of Colossus, a computer program used to assist adjusters in estimating general damages, adjuster Marshall created a range of general damages up to $10,600. (SUF, No. 22; Marshall Decl. at ¶¶27-29; Ex. O.) The total evaluated

---

[3] Allstate's adjustments for reasonable and customary rates resulted in an amount that was nearly identical to Marinelarena's actual medical expenses of $9,637. (Nokes depo at 163:23-165:21; Exhibit HH).

settlement range, including special and general damages was between $8,129 and $19,984. (Marshall Decl. at ¶30; Ex. H at CN000146-150.)

On April 6, 2018, adjuster Marshall's evaluation was reviewed by Evaluation Consultant Eduardo Escobar. (SUF, No. 23.) He agreed with adjuster Marshall's evaluation and granted settlement authority up to $19,985. (SUF, No. 24.)

That same day, adjuster Marshall called Nokes and left a message for him to contact her to discuss settlement. (Marshall Decl. at ¶36; Ex. H at CN000151.) On April 9, 2018, adjuster Marshall called Nokes again. (Marshall Decl. at ¶37; Ex. H at CN000151.) She left a voicemail and told him that Allstate wanted to settle Marinelarena's claim. (Marshall Decl. at ¶37; Ex. H at CN000151.) She extended an offer of $8,130 - $2,829 for special damages and $5,300 for general damages. (Marshall Decl. at ¶37; Ex. H at CN000151.) Later that day, adjuster Marshall wrote to Nokes and confirmed Allstate's offer. (SUF, No. 25.)

Adjuster Marshall believed that Allstate's $8,130 offer was fair and reasonable. (Marshall Decl. at ¶30.) In her experience, it was consistent with what similar cases (i.e., soft tissue, non-surgical cases) settled for. (Marshall Decl. at ¶30.) While Allstate was willing to settle for a higher number than what it believed was fair and reasonable, it would have done so only as a concession to avoid further litigation. (Marshall Decl. at ¶30.)

### H. Two months later, Nokes rejects Allstate's offer and tells Allstate to assign arbitration counsel.

Nokes did not respond to Allstate's offer. So Allstate wrote to and called Nokes in April and May 2018 to follow up. (Marshall Decl. at ¶38; Ex. H at CN000153; Ex. EE.) But he still did not respond. (Marshall Decl. at ¶38.) On June 6, 2018, Nokes told adjuster Marshall that he did not have a counter demand and he asked her to refer the matter to arbitration counsel. (SUF, No. 39.) On June 19, 2018, Nokes wrote to Allstate and confirmed his desire to commence arbitration proceedings. (Ex. Q.) He also advised that he had some issues with Dr.

Kaloostian's report and findings. (*Id.*) But he conceded that he was not qualified to criticize Dr. Kaloostian and, therefore, had asked Dr. Chambi to review Dr. Kaloostian's report. (*Id.*)

**I. Allstate assigns counsel and begins the arbitration process.**

Because Nokes told Allstate that he wanted to proceed to formal arbitration, Allstate assigned attorney Ted Endres to defend Allstate. (SUF, No. 27.) Endres immediately served written discovery and provided names of acceptable arbitrators. (SUF, No. 28.) By the end of June 2018, the parties agreed on an arbitrator and set a date for Marinelarena's deposition. (Declaration of Ted Endres ("Endres Decl.") at ¶23.)

**J. Marinelarena requests several extensions to complete discovery.**

On July 23, 2018, Nokes asked Allstate for an extension of time to respond to written discovery until August 6, 2018. (SUF, No. 29.) Allstate agreed. On July 31, 2018, Nokes asked for another extension until August 20, 2018. (SUF, No. 30.) Allstate again agreed. Nokes also asked to continue Marinelarena's deposition from its originally scheduled date of August 29, 2018; yet again, Allstate agreed and her deposition was continued to September 24, 2018. (SUF, No. 31.)

**K. Marinelarena serves a section 998 offer for $100,000, but no new information is provided to change Allstate's evaluation.**

On November 8, 2018, Marinelarena served a section 998 offer for the policy limit. (SUF, No. 32.) But Allstate did not have any new information to show that the value of the claim exceeded the prior evaluated amount. (Declaration of Jolyn Elliott ("Elliott Decl.") at ¶¶24-25, 27.) Not only had Marinelarena not had a neck surgery, she had not had any treatment at all since she saw Dr. Chambi in December 2017. (Elliott Decl. at ¶27.) And although she claimed that she sustained lost wages, the documents she provided did not establish her lost wage claim; she provided only check stubs and a self-generated list of her income – nothing objective like a tax return or a profit and loss statement. (Elliott Decl. at ¶24; Ex.

FF.) The only other information that Allstate received was an October 10, 2018 letter from Dr. Chambi stating that he disagreed with Dr. Kaloostian's report. (Elliott Decl. at ¶25; Ex. GG.)

In an effort to resolve Marinelarena's claim, on November 18, 2018, Allstate increased its offer to the top end of its settlement range, $19,985. (SUF, No. 33.) Marinelarena did not accept Allstate's increased offer. (SUF, No. 34.) Marinelarena and Nokes have since testified that any offers less than the full policy limit would not have been accepted. (SUF, No. 35.)

**L. The parties proceed to arbitration and Allstate pays the arbitration award and costs.**

On November 28, 2018, the parties went to arbitration. (SUF, No. 36.) An award for the policy limit was issued in Marinelarena's favor. (*Id.*) Allstate promptly paid the award, as well as Marinelarena's arbitration costs. (SUF, No. 37.)

To this day, Marinelarena has never undergone the neck surgery she claimed she needed. (Marinelarena depo at 33:20-34:5, Ex. W.)

## II. PLAINTIFFS' BAD FAITH CLAIM HAS NO MERIT

### A. General Bad Faith Standards

#### 1. Bad faith is the unreasonable withholding of policy benefits due.

Even if an insurance company withholds policy benefits that it is ultimately required to pay, that does not mean it breached the implied covenant of good faith and fair dealing. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346-47 (2001). The implied covenant requires insurers to be reasonable, not flawless or prescient. *Id.* at 350-51. Therefore, to establish a breach of the implied covenant, a plaintiff must show that the insurer withheld benefits unreasonably and without proper cause. *Guebara v. Allstate Ins. Co.*, 237 F. 3d 987, 992 (9th Cir. 2001); *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000); *Rappaport-Scott v. Interins Exch. of the Auto. Club*, 146 Cal. App. 4th 831, 837 (2007); *Maynard v. State Farm Mut. Auto. Ins. Co.*, 499 F. Supp. 2d 1154,

1160 (C.D. Cal. 2007).

**2. Mistakes are not enough to show unreasonableness.**

To establish unreasonableness, it is insufficient to show that a withholding of benefits or other delay was merely a result of a mistake, bad judgment, or even negligence. *Aceves v. Allstate Ins. Co.,* 68 F.3d 1160, 1166 (9th Cir. 1995) ("In California, mere negligence is not enough to constitute unreasonable behavior and does not establish a breach of the implied covenant of good faith and fair dealing in an insurance case."); *Tento Int'l, Inc. v. State Farm Fire & Cas. Co.*, 222 F.3d 660, 664 (9th Cir. 2000) (same); *Notrica v. State Compensation Ins. Fund*, 70 Cal. App. 4th 911, 931 (1999). Rather, "[b]ad faith implies dishonesty, fraud and concealment." *Merrit v. Reserve Ins. Co.,* 34 Cal. App. 3d 858, 876 (1973). Thus, the insurer's conduct must demonstrate a failure or refusal to pay an insured's claim prompted "by a conscious and deliberate act." *State Farm Fire & Cas. Co. v. Superior Court,* 45 Cal. App. 4th 1093, 1105 (1996).

**3. The existence of a "genuine dispute" precludes a finding of unreasonableness.**

As a matter of law, withholding insurance benefits is not unreasonable where a legitimate question – in legal terms, a "genuine issue" or "genuine dispute" – exists regarding the amount of payment due. *Rappaport-Scott*, 146 Cal. App. 4th at 837; *Fraley*, 81 Cal. App. 4th at 1292; *Maynard*, *supra,* 499 F. Supp. 2d at 1160; *Guebara*, 237 F. 3d at 992. A "genuine dispute" can exist as to either a legal question or a factual question. *Chateau Chamberay*, 90 Cal. App. 4th at 348; *Guebara*, 237 F.3d at 993-94; *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 669 (9th Cir. 2003).

"[W]here there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." *Chateau Chamberay*, 90 Cal. App. 4th at 347. An insurer "is entitled to be an advocate for its own interests." *Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 976 (2003); *see also*

*Dalrymple v. United Servs. Auto. Assn.*, 40 Cal. App. 4th 497, 519-23 (1995).

This means that even if an insurer delays paying, or even denies a claim it should have paid, it cannot be liable for bad faith so long as a genuine dispute existed about coverage or the amount owed:

> It is now settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability of the amount of the insured's coverage claim is not liable in bad faith . . . .

*Chateau Chamberay*, 90 Cal. App. 4th at 347; *see also Morris*, 109 Cal. App. 4th at 977; *Opsal v. United Servs. Auto. Assn.*, 2 Cal. App. 4th 1197, 1205-07 (1991).

A "genuine dispute" simply means that reasonable minds could differ about the value of the claim. *Rappaport-Scott*, 146 Cal. App. 4th at 839; *Chateau Chamberay*, 90 Cal. App. 4th at 350-51. In deciding whether there was a "genuine dispute," "the court need not decide which party is 'right' as to the disputed matter, but only that a reasonable and legitimate dispute actually existed." *Chateau Chamberay*, 90 Cal. App. 4th at 347.

Where, as here, there is no disagreement regarding what information confronted the insurer, the existence of a genuine dispute is a question of law that can and should be decided on summary judgment. *See, e.g.*, *Guebara*, 237 F. 3d at 992 ("Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage."); *Chateau Chamberay*, 90 Cal. App. 4th at 347; *Feldman*, 322 F.3d at 669-70; *Maynard*, *supra,* 499 F. Supp. 2d at 1160; *Fraley*, 81 Cal. App. 4th at 1292; *Nager v. Allstate Ins. Co.*, 83 Cal. App. 4th 284, 288 (2000); *Kerrigan v. Allstate Ins. Co.*, --- F.Supp.3d ---; 2021 WL 2389644 (C.D. Cal. June 10, 2021); *Shamiryan v. Allstate Northbrook Indem. Co.*, --- F. Supp. 2d ---; 2021 WL 3185782 (C.D. Cal. July 26, 2021).

### B. Allstate's reliance on Dr. Kaloostian's opinions precludes Marinelarena's bad faith claim.

The genuine dispute doctrine applies with particular force where, as here, an

insurer relies on an expert opinion in evaluating a claim, and courts routinely dismiss bad faith claims by summary judgment on that basis. *E.g.*, *Fraley*, 81 Cal. App. 4th at 1291-92; *Guebara,* 237 F.3d at 994-95; *Keshish v. Allstate Ins. Co.*, 959 F. Supp. 2d 1226 (C.D. Cal. 2013); *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1207, 1215 (C.D. Cal. 2002); *Allstate Ins. Co. v. Madan,* 889 F. Supp. 374, 380 (C.D. Cal. 1995).

This rule has been applied where the expert in question is a medical expert. *Maynard*, *supra,* 499 F. Supp. 2d at 1163 (insurer "entitled to rely on its orthopedic surgeon's report to dispute Plaintiff's claim"); *Badell v. Celtic Life Ins. Co.,* 159 F. Supp. 2d 1186, 1193 (N.D. Cal. 2001); *Cardiner v. Provident Life and Accident Ins. Co.*, 158 F. Supp. 2d 1088, 1102 (C.D. Cal. 2001).

Further, the rule applies even where the trier of fact ultimately rejects the opinions of the insurer's expert and finds in favor of the insured on the disputed issue. *Herr v. State Farm Mut. Auto. Ins. Co.*, 152 F.3d 925 (9th Cir. 1998) ("The fact that Dr. Herr won an award in the arbitration does not prove that State Farm handled the claim in bad faith. It proves only that he won and State Farm lost.") (unpublished); *Maynard*, *supra,* 499 F. Supp. 2d at 1161 n.5 ("[A]n arbitrator's ultimate conclusion on liability is irrelevant to a bad faith claim."); *Paulson,* 867 F. Supp. at 919 ("The fact that . . . the arbitrator subsequently found that State Farm owed [the insured] the limit of his policy does not imply that State Farm acted in bad faith in the first instance."); *Aronson v. State Farm Ins. Co.*, No. CV-99-4074 CAS BQRX, 2000 WL 667285, at *10 (C.D. Cal. May 11, 2000) ("The value that an arbitrator subsequently places on a[] claim is an after-the-fact event that may not be considered in evaluating the insurer's conduct prior to the arbitration."); *Miller v. Allstate Ins. Co.*, 1998 WL 937400, at *5 (C.D. Cal. Sept. 21, 1998) ("The fact that an arbitrator later determined that defendant owed $11,800 to Miller instead of the $1,820 offered by Allstate does not by itself constitute bad faith or unfair dealing."); *see also Chateau Chamberay*, 90 Cal. App. 4th at 342-43 (granting summary

judgment where insurer's final offer was $722,000 below arbitration award); *Fraley*, 81 Cal. App. 4th at 1287 (granting summary judgment where insurer's offer was $164,822 and arbitration award was $364,500).

Here, Allstate had legitimate questions regarding Dr. Chambi's surgical recommendation. Because Marinelarena's records showed minor injuries, limited treatment, two normal EMGs, and even two of her own treating doctors concluded she had normal neurological exams, it was reasonable for Allstate not to blindly accept the surgical recommendation. *See Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 722 (2007) (insurer is not obligated to accept the conclusions of the insured's doctor without scrutiny or investigation; instead, an insurer is within its rights to investigate by asking the insured to submit to an independent medical exam.) So it contacted ExamWorks and asked for a recommendation to a neurosurgeon near Marinelarena. Three CVs were provided. All of the doctors were eminently qualified. Allstate selected Dr. Paul Kaloostian, who was a board certified practicing neurosurgeon and associate professor of neurosurgery.

Dr. Kaloostian examined Marinelarena and issued a report. His report showed that he conducted a thorough review. He took an oral history, physical examination, and record review. He concluded that Marinelarena sustained an exacerbation of a pre-existing condition, that only six months of post-accident treatment was reasonable, and surgery was not necessary. And Allstate had no reason to doubt this opinion. After all, it was consistent with Marinelarena's records, objective testing, and the conclusions of every other doctor who examined her. The only outlying opinion was Dr. Chambi's.[4] Therefore, Allstate acted reasonably by relying on Dr. Kaloostian's opinion.

---

[4] Marinelarena did not trust Dr. Chambi's opinion either. It has been almost 4 years since Dr. Chambi recommended surgery (and since Marinelarena last saw a doctor for her alleged accident related injuries), yet she still has not had (or scheduled) the

For these reasons, at a minimum, there was a genuine dispute as to the nature and extent of Marinelarena's injuries and what future treatment, if any, was appropriate. And because Allstate reasonably relied on Dr. Kaloostian's opinion, Allstate cannot, as a matter of law, be liable for bad faith.

**C. Marinelarena cannot show she was entitled to benefits, so her bad faith claim fails.**

In order to recover for bad faith, Marinelarena must show that she was entitled to benefits under the Allstate policy. But she never complied with the statutory mandate for filing an uninsured motorist claim. Therefore, she cannot show that she was entitled to benefits and her bad faith claim fails.

To show that she was involved in an accident with an uninsured motorist (and entitled to uninsured motorist benefits), the California Insurance Code requires – in cases involving hit and run drivers – that an insured: "file[ ] with the insurer within 30 days [after the accident] a statement under oath that the insured or his or legal representative has or the insured's heirs have a cause of action arising out of the accident for damage against a person or persons whose identity is unascertainable and set forth facts in support thereof." Cal. Ins. Code § 11580.2, subd. b, (2).

Marinelarena, however, never provided Allstate with a statement under oath advising that she had a cause of action against an unascertainable person. Her failure to comply with the mandates of Cal. Ins. Code § 11580.2, subd. b, (2) precludes her right to benefits and her bad faith claim as a matter of law.

"It is axiomatic that 'a bad faith claim cannot be maintained unless policy benefits are due.'" *Myers v. Allstate Indem. Co.*, 109 F. Supp. 3d 1331, 1337 (C.D. Cal. 2015), quoting *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990). *Sahakyan v. Explorer Ins. Co.*, 2020 Cal. Super. LEXIS 2978 (July 24, 2020) (Kin, J.) is on point. In that case, the plaintiff failed to comply with the same code section

---

surgery that Dr. Chambi concluded was necessary. In fact, she no longer sees Dr. Chambi. (Marinelarena depo at 33:20-34:5, Ex. W.)

requirement to make a police report. The court held that because the plaintiff failed to make a police report as required by Cal. Ins. Code § 11580.2, subd. b, (2), he could not show that he was entitled to coverage, i.e. that there were any benefits due; therefore, his bad faith claim failed. That case disposes of Marinelarena's claim.

*Sahakyan* is not novel. Courts have repeatedly dismissed claims that did not comply with the requirements of Cal. Ins. Code § 11580.2. *See e.g. Blankenship v. Allstate Ins. Co.*, 186 Cal. App. 4th 87, 94 (2010) ("[Section 11580.2(i)] imposes an *absolute obligation* on the insured to comply with its mandates or else the insured forfeits his claim.") (emphasis added); *Juarez v. 21st Century Ins. Co.*, 105 Cal. App. 4th 371, 377 (2003) ("[T]he statutory language clearly shows that the Legislature intended to impose *strict prerequisites* … for claims involving uninsured motorists.").

At a minimum, the failure to comply with Section 11580.2 undermines any claims of delay. Stated differently, there can be no delay when an insured fails to comply with statutory mandates. In similar contexts involving violations of other subsections of Cal. Ins. Code § 11580.2, this Court has held, as a matter of law, there can be no delay when an insured fails to comply with statutory mandates.

In *Myers, supra,* 109 F. Supp. 3d at 1336-37, for example, the insured argued that her insurer unreasonably delayed investigating and setting up arbitration for her UM claim. This Court, however, ruled that because the insured failed to provide an authorization to obtain medical records, under Insurance Code section 11580.2(o), her right to UM arbitration – and by extension her right to policy benefits – was stayed until 30 days after she provided that authorization. *Id*. (citing *Morgan v. Allstate Ins. Co.*, No. B237788, 2013 WL 1411831, at *5 (Cal. Ct. App. Apr. 9, 2013) (unpublished)); *accord Kerrigan, supra,* 2021 WL 2389644, at *9 n.8 (noting an insured's failure to return the statutorily required medical authorization stayed her right to arbitration, which "essentially stays an insured's right to any

payment under the policy"). *See also*, *Zurich Ins. Co. v. Killer Music, Inc.*, 998 F.2d 674, 680 (9th Cir. 1993) (holding insurer not liable for unreasonable delay because "without actual presentation of a claim by the insured in compliance with claims procedures contained in the policy, there is no duty imposed on the insurer to investigate the claim."); *California Shoppers, Inc. v. Royal Globe Ins. Co.,* 175 Cal.App.3d 1, 54 (1985) (same). And because "[t]t is axiomatic that 'a bad faith claim cannot be maintained unless policy benefits are due,'" the court held the insurer could not have unreasonably delayed in bad faith during that time period. *Meyers*, 109 F. Supp. 3d at 1336-37 (citing *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1153 (1990)).

For these reasons, Marinelarena's bad faith claim should be dismissed.

**D. Allstate cannot be liable for "unreasonable delay" while it gathered relevant information to evaluate plaintiffs' claim**

Under California law, an insurer has a right to fully investigate a claim before paying it. As a matter of law, an insurer is not obligated to pay a claim "until it [can] find out on its own, to a measure of certainty," that benefits are owed. *Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 924 (1979); *see also Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753, 759 (9th Cir. 2012) (noting an insurer is not required to rely on uncorroborated assertions by a claimant or her attorney). Thus, "[t]here can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insured." *Globe Indemnity Co. v. Superior Court*, 6 Cal.App.4th 725, 731 (1992); *accord Maynard*, *supra,* 499 F. Supp. 2d at 1160 (holding that "delay while the insurer seeks information and investigates the insured's claim" does not give rise to liability for bad faith).

Here, it is undisputed that Marinelarena waited almost two years after the accident before she submitted her UM claim - it wasn't until December 5, 2017 that Marinelarena told Allstate that she wanted to pursue her UM claim. Even then, she told Allstate that she did not want Allstate to do anything until she presented a

demand. Once she presented a demand – in January 2018 – Allstate immediately gathered records and scheduled Marinelarena for an independent medical exam on an agreed upon date. Less than 10 days after Allstate received the IME report, it extended an offer based on the medical expert's findings. Marinelarena waited two months before she rejected Allstate's offer and asked Allstate to assign counsel.

Allstate then immediately sent out written discovery, agreed on an arbitration, and scheduled Marinelarena's deposition. The only delay during the arbitration process was Marinelarena's repeated requests for more time to complete discovery. Even after the arbitration, Allstate acted diligently. It paid the arbitration award and Marinelarena's costs within a couple of weeks after Allstate received the arbitrator's decision.[5]

Quite simply, there was not so much as a hint of delay on Allstate's part.[6]

**E. Marinelarena's bad faith claim is time barred.**

The statute of limitations for a claim for tortious breach of the implied covenant is two years. *Archdale v. Am. Internat. Specialty Lines Ins. Co.,* 154 Cal. App. 4th 449, 467 n.19, 64 Cal. Rptr. 3d 632 (2007). The California Supreme Court has held that a cause of action accrues for statute of limitations purposes when "events have developed to a point where plaintiff is entitled to a legal remedy." *Davies v. Krasna*, 14 Cal. 3d 502, 513 (1975). "The infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period. . . . [N]either uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations." *Id.* at 514.

---

[5] Marinelarena's lawyer conceded that the arbitration was completed in a reasonable time. (Nokes depo. at 219:19-24, Ex. C.)

[6] Moreover, because "a genuine dispute existed as to the amount payable" on Marinelarena's claim, she cannot "state a cause of action for breach of the implied covenant based on an unreasonable delay in payment of policy benefits." *See Rappaport-Scott*, 146 Cal. App. 4th at 839.

In the insurance context, "[t]here are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Love*, 221 Cal. App. 3d at 1151. In the context of a bad faith lawsuit arising from a UM claim, completion of UM arbitration is *not* a prerequisite for a bad faith claim to accrue entitling an insured to sue for unreasonable handling of the claim. *See Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 378 (9th Cir. 1997) ("Where the owner of an uninsured motorist policy makes a claim for which liability of the uninsured motorist is clear and damages plainly exceed the uninsured motorist coverage policy limits, and the insurer unreasonably refuses to pay, then the insurer is liable for tort damages under California law for breach of the implied covenant of good faith and fair dealing, without arbitration.").

There is authority from this Court that is directly on point. In *Dlugitch v. Liberty Mut. Fire Ins. Co.*, 2014 U.S. Dist. LEXIS 66396 (C.D. Cal. April 22, 2014), the Court held that the two year statute of limitations runs from the date the bad faith claim accrues, not the date of the uninsured motorist arbitration. Judge Gee explained that:

> Dlugitch did not need to wait until after the close of arbitration to bring suit when he knew the facts regarding Liberty Mutual's delay in making payments as early as January of 2008, almost five years before he filed the December 2, 2012 Complaint. Once Dlugitch became aware of Liberty Mutual's [alleged bad faith], Plaintiff possessed the requisite factual basis to bring suit."

*Dlugitch*, 2014 U.S. Dist. LEXIS 66396 at *8-9.

Here, Marinelarena argues that her claim was always worth the policy limit and that Allstate acted unreasonably by not paying her the policy limit in response to her demand. Marinelarena's first policy limit demand was made in January 2018. Allstate rejected the demand and made a counter-offer in April 2018. To the extent that Marinelarena claims that Allstate acted in bad faith by not accepting her policy

limit demands and forcing her to pursue arbitration,[7] her bad faith claim accrued on April 2018. But she did not file her lawsuit until November 24, 2020 – more than two and a half years later and after the statute of limitation ran.[8] As a result, Marinelarena's bad faith claim is time-barred.

**F. Marinelarena's inability to show economic loss precludes an award for emotional distress or punitive damages.**

In the absence of economic loss, Marinelarena is not entitled to recover damages for emotional distress. *Waters v. United Services Auto. Assn.*, 41 Cal. App. 4th 1063, 1081 (1996) ("case law simply does not permit recovery of emotional distress damages where, as here, there is no evidence of financial loss."); *Maxwell v. Fire Ins. Exch.*, 60 Cal. App. 4th 1446 (1998) (following *Waters*); *McCarthy v. State Farm Mut. Ins. Co.*, 2000 U.S. Dist. LEXIS 12020 *15 (C.D. Cal. August 7, 2000) (Collins, J.)

A delay in paying policy benefits does not establish financial loss. Nor does the loss of use of insurance proceeds. And the risk of financial loss is also insufficient to show economic loss. *Waters*, 41 Cal. App. 4th at 1077, 1080. But here, at best, that is all that Marinelarena can show. (Marinelarena depo. at 118:15-23.) She cannot show that she sustained any actual economic loss caused by Allstate's alleged bad faith. (Marinelarena depo. at 39:5-40:15; 46:23-50:15; 68:23-69:17, Ex. W.) To the extent she lost wages, that would have been as a result of the accident. Even still, she cannot show that she had any wage loss beyond 2016 and certainly not at the time she made her demand in January 2018. (Marinelarena depo. at 15:8-24; 66:9-68:22, Ex. W.) In fact, she continued to go on vacations before, during, and after she submitted a claim. (Marinelarena depo. at 52:20-57:1, Ex. W.)

---

[7] Complaint, Ex. II.

[8] See Dckt. Doc. No. 1.

Because she cannot show any economic loss, she cannot recover damages for emotional distress or punitive damages. *See Continental Ins. Co. v. Superior Court*, 37 Cal. App. 4th 69, 86 (1995). Her bad faith claim should be dismissed. *McCarthy, supra,* 2000 U.S. Dist. LEXIS 12020 *15 (California courts dismiss bad faith claims as a matter of law where the Plaintiff cannot show the required substantial economic loss, regardless of whether it is shown that the insurer acted unreasonably.)

**G. The punitive damages claim fails as a matter of law.**

Regardless of how the Court rules on Marinelarena's bad faith claim, it should eliminate their claim for punitive damages because she has no evidence to support it. Several standards governing punitive damages apply here.

First, to recover punitive damages, plaintiffs must provide clear and convincing evidence of fraud, oppression or malice. Cal. Civ. Code § 3294.

- "Fraud" is "an intentional misrepresentation, deceit or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).
- "Oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of the person's rights." Cal. Civ. Code § 3294(c)(2). "Despicable conduct" is conduct "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Stewart v. Truck Ins. Exch*, 17 Cal. App. 4th 468, 483 n. 29 (1993).
- "Malice" means either (1) "conduct which is intended by the defendant to cause injury to the plaintiff or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard for the rights or safety of others." Cal. Civ. Code § 3294(c)(1). "Evil motive is the central element of the

malice which justifies an exemplary award." *O'Hara v. Western Seven*, 75 Cal. App. 3d 798, 806 (1977).

Second, on summary judgment, the court must test a punitive damages claim under the heightened "clear and convincing evidence" standard. *Anderson v. Liberty Lobby Inc.*, 411 U.S. 242, 254 (1986) ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden"); *Board of Trustees of Univ. of Illinois v. Insurance Corp. of Ireland*, 969 F. 2d 329, 332 (7th Cir. 1992) (applying "clear and convincing" standard on motion for summary judgment). Thus, to survive summary judgment, plaintiffs must present evidence for punitive damages that is strong enough to command "the unhesitating assent of every reasonable mind." *In re Angelia P.*, 28 Cal. 3d 908, 919 (1981).

Third, "the evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith." *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg.*, 78 Cal. App. 4th 847, 909-10 (2000) (citation omitted). Evidence of bad faith - without more - does not support a claim for punitive damages. *Beck v. State Farm*, 54 Cal. App. 3d 347, 355-56 (1976); *Stewart*, 17 Cal. App. 4th at 483.

Fourth, the evidence must not be merely consistent with the theory of oppression, fraud, or malice. Rather, Marinelarena must produce evidence that is inconsistent with any other explanation: "some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such non-iniquitous human failing." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1287-88 n. 14 (1994).

Finally, a plaintiff seeking punitive damages against a corporation must show by clear and convincing evidence that the act constituting malice or oppression was

committed or ratified by an "officer, director, or managing agent." *Cruz v. HomeBase*, 83 Cal. App. 4th 160, 163 (2000); *White v. Ultramar, Inc.*, 21 Cal. 4th 563 (1999).

Here, Marinelarena cannot meet these strict standards. There is no evidence – much less clear and convincing evidence – of malice, oppression, fraud. Further, Marinelarena cannot show ratification of any malicious, fraudulent or oppressive act by a managing agent. (Fuizzotti Decl. at ¶48; Marshall Decl. at ¶40; Elliott Decl. at ¶31; Declaration of Eduardo Escobar at ¶¶1-2; and Declaration of Kendra Cardiasmenos at ¶¶1-2.) Therefore, the Court should grant partial summary judgment on the claim for punitive damages.

## III. CONCLUSION

For any one, or all, of the above reasons, the Court should grant Allstate's motion for summary judgment. And regardless of how the Court rules on the bad faith claim, the claim for punitive damages should be dismissed.

Dated: December 6, 2021

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By /s/ Jordan S. Derringer
JORDAN S. DERRINGER
PETER H. KLEE

Attorneys for Defendant
ALLSTATE NORTHBROOK INDEMNITY COMPANY